## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION
## CINCINNATI, OHIO

**RAY HEID,**                                                    **Case Number**
**C/O THE LAW OFFICE OF ERIC ALLEN, LTD**
**4200 Regent, Suite 200, Judge**
**Columbus, Ohio 43219**

**AND**

**JAMES DAMRON,**
**C/O THE LAW OFFICE OF ERIC J ALLEN, LTD**
**4200 Regent, Suite 200**
**Columbus, Ohio 43219**

                                                        **Magistrate**

             **Plaintiffs**

**v.**

**ANNETTE CHAMBERS-SMITH**
**DIRECTOR, OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS**
**IN HER INDIVIDUAL AND PROFESSIONAL CAPACITY**
**4545 Fisher Road, Suite D,**
**Columbus, OH 43228**

**AND**

**DEFENDANT JOHN DOE -ATTORNEY**
**SUED IN THEIR PERSONAL AND PROFESSIONAL CAPACITY**

**AND**

**LIEUTENANT ADERHOLT**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5701 Burnett**
**Leavittsburg, Ohio 44430**

**AND**

**LESLEE CARADINE**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5701 Burnett**
**Leavittsburg, Ohio 44430**

1

**AND**

**JENNINGS, MAILROOM**
**IN HER PERSONAL AND PROFESSIONAL CAPACITY**
**5701 Burnett**
**Leavittsburg, Ohio 44430**

**AND**

**KIM FREDERICK**
**IN HER PERSONAL AND PROFESSIONAL CAPACITY**
**5701 Burnett**
**Leavittsburg, Ohio 44430**

**AND**

**BRIAN COOK**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**JARROD ROBINSON**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**LIEUTENANT ASH**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**LIEUTENANT ROBERTS**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**LIEUTENANT WARD**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**

2

**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**LIEUTENANT WIGGINS**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**UNIT MANAGER M. GOOD**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**CASE MANAGER SHUVALIS**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**STG SUPERVISOR GILLUM**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**CAPTAIN WINDOM**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**SARGEANT ROSE**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

3

**SARGEANT SCHUMACHER**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**CORRECTIONS OFFICER FIGGINS**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**CORRECTIONS OFFICER HUFFMAN**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**MAILROOM WORKER WRIGHT**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**INSPECTOR MILLER**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**LIEUTENANT JOHN DOE**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

**AND**

**LIEUTENANT JOHN DOE**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5900 BIS Road**
**Lancaster, Ohio 43130**

4

**AND**

**WARDEN DONNY MORGAN**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**16149 State Route 104**
**Chillicothe, Ohio 45601**

**AND**

**SARGEANT DETTY**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**16149 State Route 104**
**Chillicothe, Ohio 45601**

**AND**

**TROY DONALDSON**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**16149 State Route 104**
**Chillicothe, Ohio 45601**

**AND**

**ERIC GRAVES**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**16149 State Route 104**
**Chillicothe, Ohio 45601**

**AND**

**ROBERT LETTS**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**16149 State Route 104**
**Chillicothe, Ohio 45601**

**AND**

**SARGEANT B. SMITH**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**16149 State Route 104**
**Chillicothe, Ohio 45601**

**AND**

5

**WANZA JACKSON MITCHELL**
**IN HER PERSONAL AND PROFESSIONAL CAPACITY**
**5787 State Route 63**
**Lebanon, Ohio 45036**

**AND**

**LIEUTENANT AGEE**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5787 State Route 63**
**Lebanon, Ohio 45036**

**AND**

**MAILROOM WORKER ROSENGARTEN**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**5787 State Route 63**
**Lebanon, Ohio 45036**

**AND**

**WARDEN SHEA HARRIS**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**3791 State Route 63**
**Lebanon, Ohio 45036**

**AND**

**LIEUTENANT SHANKLIN**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**3791 State Route 63**
**Lebanon, Ohio 45036**

**AND**

**CASE MANAGER SHIVLEY**
**IN HIS PERSONAL AND PROFESSIONAL CAPACITY**
**3791 State Route 63**
**Lebanon, Ohio 45036**

**AND**

**OHIO PAROLE BOARD**
**4545 Fishers Road**
**Columbus, Ohio 43228**

6

**Defendants,**

---

### COMPLAINT FOR RELIEF UNDER 42 U.S.C. 1983

### TRIAL BY JURY DEMANDED

---

## INTRODUCTION

**1.**     Plaintiffs are members of the Christian Separatist Church. This belief system has been approved by the Ohio Department of Rehabilitation and Corrections (from now on, ODRC). Without warning or rationale, it was determined that this particular theology was a Special Threat Group (from now on STG)

**2.**     Based on this classification, ODRC uses the many names of defendants to collect and destroy religious texts and music. These Defendants have also transferred both Plaintiffs without reason and rationale.

**3.**     Both Plaintiffs have suffered retaliation and retribution for attempting to exercise their protected First Amendment right of religious freedom. This includes manufacturing rule and regulation violations, placement in Security Control (the hole), and denying them access to the court system.

## JURISDICTION

4.     This Court has jurisdiction over the action under 28 U.S.C. §§ 1331 and 1343. This action arises under the Fourteenth Amendment to the United States Constitution and under federal laws, 42 U.S.C. §§ 1981, 1983, 1986.

**VENUE**

5.      Venue in this Court is proper under 28 U.S.C. § 1391. This court has personal jurisdiction over the defendants sued in their capacities in this matter because the events giving rise to this claim occurred in this district.

**EXHAUSTION**

6.      The Sixth Circuit has advised that" a prisoner is not required to plead exhaustion in the complaint." **Peoples v Choppler, 261 Fed Appx. 858 (6th Circuit, 2008).** Heid argues that some of his allegations are not exhausted because of frustrated access to the grievance process and fear of retaliation.

7.      Plaintiff Damron has exhausted all his claims under the Prisoner Litigation Reform Act.

**RE-FILING OF THE LAWSUIT**

8.      This is a refiling of a lawsuit in the Southern District of Ohio that was given case number 21 CV 901. This matter was dismissed voluntarily under Civil Rule 41.

9.      Under Ohio Revised Code § 2305.19, when a §§ 1983 or 1985 suit fails "otherwise than on the merits," the plaintiff may refile within one year of the judgment disposing of it. Opposing Counsel, Assistant Attorney General Mindy Worly has indicated that the savings clause applies. This date is **March 17, 2025**.

**PARTIES**

10. Plaintiff Ray Heid is a resident of Ohio and lives within the Western Division of the Southern District of Ohio. He is incarcerated for convictions from Scioto County, Ohio, including murder.

11. Plaintiff James Damron is a resident of Ohio and lives within the Western District of the Southern District of Ohio. He is incarcerated for convictions from Scioto County, including murder.

12. Defendant Annette Chambers-Smith is the Director of the Ohio Department of Corrections and Rehabilitation (from now on ODRC). She oversees all matters involving ODRC. She is being sued in her personal and professional capacity.

13. Defendant John Doe (whose Identity will be produced through discovery) is employed by the State of Ohio as an attorney. Further discovery is needed to ascertain identity. The defendant is being sued in their personal and professional capacity and at all times acted under the color of state law.

14. Defendant John Doe (whose Identity will be produced through discovery) is employed by the State of Ohio as an attorney. Further discovery is needed to ascertain identity. Defendants are being sued personally and professionally and consistently act under the color of state law.

15. ODRC employs Defendant Lieutenant Aderholt as a Lieutenant and STG (Special Threat Group) Coordinator at Trumball Correctional Facility. At all times of alleged facts in this complaint, Aderholt acted under the color of state law. He is being sued in his personal and professional capacity.

16. ODRC employs Defendant Leslee Caradine as a Lieutenant and Mailroom Supervisor at Trumball Correctional Institution. He is being sued in his personal

and professional capacity and at all times acted under the color of state law. His duties include supervising the mailroom at TCI.

17. ODRC employs Defendant Jennings as a mailroom worker at Trumball Correctional in Trumball, Ohio. She is being sued in her personal and professional capacity. Her duties include processing mail outlined by OAC 5120-9-17, 18, 19, and 75-Mal-02.

18. ODRC employs Defendant Kim Frederick as the institutional inspector for Trumball Correctional Institution in Trumball, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law.

19. Defendant Brian Cook is the Warden of Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity. He is responsible for the day-to-day operations of the Southeastern Correctional Institute. He always acted under the color of state law relevant to this action.

20. ODRC employs Defendant Jarrod Robinson as the Deputy Warden of Operations at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued personally and professionally and at all times relevant to this action acted under the color of state law. Robinson's duties at SCI include overseeing operations.

21. ODRC employs Defendant Ash as a Lieutenant at SCI. He is being sued personally and professionally and at all times relevant to this action acted under the color of state law. Defendant Ash supervises and trains mailroom staff at the Southeastern Correctional Facility.

22.     ODRC employs Defendant Roberts as a Lieutenant and STG Coordinator at Southeastern Correctional Institute in Lancaster, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include supervision of all STG inmates at SCI.

23.     ODRC employs Defendant Ward as a Lieutenant at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include chair of the RIB committee at SCI.

24.     ODRC employs Defendant Wiggins as a Lieutenant at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include oversight of operations at SCI.

25.     ODRC employs Defendant M. Good as the Unit Manager Chief at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in both his personal and professional capacity and at all times acted under the color of state law. Defendant Good's duties include security review appeals.

26.     ODRC employs Defendant Shuvalilus as a case manager at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in her personal and professional capacity and always acted under the color of state law. Duties include recommendations for transfers of inmates.

27.     ODRC employs Defendant Gillum as the Southeastern Correctional Institution STG supervisor. He is being sued in his personal and professional capacity and at

all times acted under the color of state law. He is responsible for supervising STG groups at this institution.

28. Defendant Windom is employed by ODRC Southeastern Correctional Institution in Lancaster, Ohio as a captain. He is being sued in his personal and professional capacity.  Duties include oversight of operations at SCI.

29. ODRC employs Defendant Rose as a sergeant at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity. Duties include serving on the RIB committee at SCI.

30. ODRC employs Defendant Schumacher as a Sergeant at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity.

31. ODRC employs Defendant Figgins as a corrections officer at the Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law.

32. ODRC employs Defendant Huffman as a correction officer at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law.

33. ODRC employs Defendant Wright as a mailroom worker at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include processing mail according to the Ohio Administrative Code.

34. ODRC employs Defendant Miller as an institutional inspector at Southeastern Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law.

35. Defendant John Does is employed by ODRC (identity to be determined in discovery) as a Lieutenant at Southeastern Correctional Institution in Lancaster, Ohio. They are being sued in their personal and professional capacity and at all times act under the color of state law. Duties include supervising property in the vault for transfers of inmates.

36. Defendant John Does is employed by ODRC (identity to be determined in discovery) as a Lieutenant at Southeastern Correctional Institution in Lancaster, Ohio. They are being sued in their personal and professional capacity and at all times acted under the color of state law. Duties include supervising property in the vault for transfers of inmates.

37. ODRC employs Defendant John Doe as a mailroom worker in the Southeastern Correctional Institution in Lancaster, Ohio. They are being sued in their personal and professional capacity and at all times acted under the color of state law. Duties include

38. ODRC employs Defendant Morgan as Warden of Ross Correctional Institution in Chillicothe, Ohio. He is being sued in his personal and professional capacity and at all times acted under state law. Duties include supervising all daily operations of RCI.

39. ODRC employs Defendant Detty as a Sergeant at Ross Correctional Facility in Chillicothe, Ohio. He is being sued in his personal and professional capacity and at

all times in this action, acting under the color of state law. He is responsible for sitting on the Rules Infraction Board at Ross Correctional.

40.  ODRC employs Defendant Donaldson as a case manager for Ross Correctional in Chillicothe, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. His duties at RCI include security reviews and recommendations for transfers.

41.  ODRC employs Defendant Graves as a Lieutenant and STG coordinator at Ross Correctional Institution in Chillicothe, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Graves supervises institutional STG at RCI.

42.  ODRC employs Defendant Letts as the Unit Management Chief for Ross Correctional Institution. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include security review appeals at the institution.

43.  ODRC employs Defendant Smith as a Sergeant at Ross Correctional Institution in Chillicothe, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include sitting on the RIB committee for RCI.

44.  ODRC employed Defendant Wanza Jackson Mitchell as the Warden of Warren Correctional in Lebanon, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. He is responsible for overseeing all activity at Warren Correctional.

45. ODRC employs Defendant Agee as a Lieutenant and Mailroom Supervisor at Warren Correctional in Lebanon, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law.

46. ODRC employs Defendant Rosengarten as a mailroom worker at Warren Correctional in Lebanon, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include the processing of mail according to the Ohio Administrative Code.

47. ODRC employs Defendant Harris as Warden of Lebanon Correctional Institution in Lebanon, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. His duties include all daily operations at Lebanon Correctional.

48. ODRC employs Defendant Shanklin as a Lieutenant at Lebanon Correctional Institution in Lancaster, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include the supervision of STG inmates at SCI.

49. ODRC employs Defendant Shivley as a Case Manager at Lebanon Correctional Institution in Lebanon, Ohio. He is being sued in his personal and professional capacity and at all times acted under the color of state law. Duties include security reviews of inmates and recommendations for transfers of inmates.

50. The Ohio Parole Board is a group of individuals that are appointed by the governor to determine suitability for release into society. They are being sued in their personal and professional capacity and at all times acted under the color of state law.

## ALLEGATIONS OF FACT

51. Plaintiff realleges all facts contained in paragraphs 1-50.

*Denial of Theological Texts*

52. Plaintiff Ray Heid ordered two books from Amazon while incarcerated at Southeastern Correctional. Both books arrived at Southeastern on September 10, 2018. Defendants Wright and John Doe only forwarded Heid one of the books on September 10, 2018. Wright and John Doe detained the other book.

53. Defendants Wright and Ash stated in grievance that Amazon was not an approved vendor regarding this withholding. This was the justification provided to Plaintiff Heid.

54. On August 15, 2019, Plaintiff Damron received notification that material would be withheld according to ODRC policies and procedures. The notification dealt with the book Rise of the Aryans: How Whites Influenced and Established Global Civilization. Defendant Jennings issued this notification. This notification was issued *Only* because of the title of the book.

55. Defendant Warden Jennings, Wright, and Ash failed to review these books and determine that this was a theological text.

*Confiscating Religious Compact Discs*

56. In November 2013, Defendant Chambers Smith promulgated a policy that compact discs and compact disc players would not be allowed. A grandfather clause would allow those with compact discs and compact disc players to keep them.

57. Plaintiffs could order and receive religious compact discs after November 1, 2013. They were also allowed to keep these compact discs at the Chapel at Ross

Correctional. Heid could not keep his religious compact discs when he moved to SCI. This places a substantial burden upon Heid to receive spiritual guidance and nourishment from this music and sermons.

*Religious Correspondence Interference*

58.  As Christian Separatists, we have a duty to write and receive correspondence from other church members. This writing to one another helps the members meet and have fellowship, even through correspondence only.

59. Defendant Wright confiscated correspondence from Heid, claiming that it was STG-related, on November 7, 2018. This fails to meet the exclusion policy mandates of OAC 5120-9-17 (G). This appealed to Defendant Robinson. He rendered the exclusion lawful and stated that the Plaintiff's religious order was a hate group. Heid filed a grievance related to this designation on November 28, 2018.

60. Defendant Wright also withheld correspondence from Damron to Plaintiff Heid and another inmate, David Gerald. The rationale was that the writings were antisemitic and STG-related. Damron filed objections on December 7, 2018.

61. On June 25-2019, Defendant Rosengarten withheld three religious letters claiming these were STG-related.

62. The correspondence that has been confiscated has no relation to STG groups. This correspondence does not promote criminality or violent gang activity or otherwise advise anyone to disturb the peace of the prison.

63. The withholding of this correspondence is not rationally related to maintaining security. The obvious alternative is to train mailroom staff properly, apply policy

guidelines, and recognize the Christian Separatist Church as permissible religious practices.

*Interference with Religious Compact Discs and Other Materials*

64.  Heid cannot meet at a church to practice his religion. He relies heavily upon compact discs. These discs provide instruction, guidance, and teaching. Defendant Windom at Southeastern Correctional contacted Defendant Huffman to confiscate these compact discs. Windom claimed this was contraband. He did this to suppress his religious beliefs. Huffman assisted Windom in confiscating these compact discs.

65. Defendant Huffman a contraband ticket. At the hearing, Defendant Schumacher found Heid not guilty of having contraband and ordered the compact discs returned.

66. Heid spoke to his Unit Manager, Defendant Miller, and Robinson. The compact discs were not returned. This confiscation and withholding of the items as contraband violated Heid's right to freedom of religion.

*Confiscation of Bibles and other Religious Materials*

67. The Christian Separatist faith requires followers to study, prove everything, and seek full knowledge of the truth. Adherents accomplish this by reading Bibles, Christian Separatist, briefs, and texts such as Mein Kampf: A Translation Controversy.

68. Defendants Graves, RCI STG Coordinator, Defendant Roberts, SCI STG Coordinator, Defendant Chambers-Smith, unknown John Doe Attorneys, Defendant Gillum, and Brian Nicewagner participated in a conspiracy to interfere with Heid's religious practices by confiscating bibles, texts, and books.

69. Specifically, Defendant Graves contacted Defendant Aderholt advising them to order Damron to send home the following texts:  The New Testament: Anointed Standard Translation, Nestle and Aland Greek and English translation of the New Testament, Septuagint Greek and English Translation of the Old Testament by Sir Lancelot Brenton, The New English Translation of the Septuagint and Thompsons Chain Reference Study Guide.  This was done.

70. The remainder was returned to him. However, it was missing:  His pastoral letters, Bible Studies, Christian Separatists Articles of Agreement, Christian Separatist Private Charter, Christian Separatist Prison Charter, Addendum to the Handbook on Religion, three-ring binders, History of the Runic Cross, Outline of the Christian Separatist Faith, Separatist Brief, and Notice that Christian Separatism is a valid religion from ODRC.

71. Roberts confiscated the following from Heid: NETS Bible, The Truth Unveiled, The Lost Tribes, Separatist Briefs, Was Adolf Hitler a Christian Separatist, Pastoral Letters, Mein Kampf, and a cover page of the Christian Separatist tome. Heid received back his NETS Bible, The Truth Unveiled, and the Lost Tribes. They have also confiscated the book "War Against White" from Plaintiff Damron.

72. STG officials named above excluded the remaining literature because of the Aryan Symbolism, the Runic Cross, the Unique Greek Cross of the White Cross Ministries, and the swastika. They have repeatedly denied the use of these symbols. The same officials have allowed the Nation of Islam to use their crescent moon and stars. They have allowed the Moorish Temple adherents to use the five-pointed star and crescent moon.

19

**73.** Defendants' actions were not related to maintaining security. Both the Runic Cross and the Unique White Cross had previously been permitted. Further, the swastika has been allowed for use by Hindu practitioners. The swastika is also permitted on countless book covers within the library. Heid has found books with a swastika at Ross Correctional, Southeastern Correctional, and Lebanon Correctional.

**74.** Books housed at the prison library must undergo the same screening process as the letters contained in OAC 5120-9-17.

*Targeting Christian Separatist Symbols*

**75.** The Runic Cross and the Unique Greek White Cross are symbols used by the Christian Separatist Church. The plaintiffs use them as instrumental teaching tools in Christian Separatism. Other separatist groups are allowed to use their specific symbols in practicing their religion.

**76.** Defendants Graves and Gilliam advised Damron on April 11, 2019, that the Christian Separatist Church Society was now an unauthorized group and banned from practicing at ODRC. As a result, the Runic Cross and the White Cross were STG symbols. Only a prisoner who was an adherent or was interested in rooting out white separatist groups would be able to determine the difference between a normal cross and the Runic or White Cross. The Swastika, admittedly, is more well known than the crosses, but is still a symbol used for thousands of years and in fact covers the floor of the Washington County Courthouse in Marietta, Ohio.

**77.** When advised of this new determination, Heid and Damron were told this was directed by Defendant Chambers Smith and the two John Doe Defendant attorneys. Defendant Gillum refused to put this new determination in writing.

20

78. This determination results in suppressing the religious rights of the Plaintiffs. It also threatens further disciplinary action if the Plaintiffs use the symbols. It also caused all of the material held by the Plaintiffs to be confiscated.

79. This restriction is not related to maintaining prison's security. ODRC had previously determined that both symbols were permitted and allowed Plaintiffs to possess them. There has been no discussion or explanation of the policy change. Plaintiffs and other adherents are not practicing this religion in the open in

*Conduct Reports*

80. Defendants Chambers-Smith, Defendant John Doe Lawyers, Defendant Gillum, and Nicewagner have used conduct reports to retaliate against Plaintiffs.

81. On March 28, 2019, Defendant Graves and Gillum directed Defendant Graves to place Damron in security control under investigation. They further confiscated all property was seized. Damron was given a ticket for violating rules 17, 46, and 54.

82. Defendants Chambers Smith, Defendant John Doe Attorneys, Defendant Nicewagner, Defendant Gillum, and Defendant Graves have used Rule 17 to threaten punishment to punish Damron for exercising his religious beliefs. This rule restricts inmates from intentional aggression toward others.

83. Defendants have retaliated with Rule 46 to prevent Damron from developing the Ohio Chapter. Rule 46 deals with the bringing of contraband into a prison. Rule 54 deals with stealing and embezzlement of property. Both Plaintiffs have been retaliated against using these three rule violations.

84. Plaintiff Heid was given rule seventeen for possessing books with swastika pictures of a swastika and two bolts on his electronic tablet. Both symbols passed screening in 2013. Now, they do not pass muster without justification.

85. Plaintiff Heid was issued a Rule 51 violation for possessing the same books and the printouts from his electronic tablet.

86. Heid appeared at an RIB hearing with Defendants Ward and Rose. Defendant Ward told Heid he had to find him guilty because Defendant Chambers-Smith and Defendant John Doe's Lawyers ordered him to do so.

87. On Appeal to Defendant Cook, Defendant Cook found the infractions justified. Defendant Cook again reiterated that Defendant Chambers-Smith and Defendant John Doe's attorneys directed him to find Heid guilty of the violation. Heid had the RIB infection affirmed by Warden.

88. Defendants Shanklin and Shively called Heid to the STG office on 5-23-2019. He is told that he will be further punished if he creates anything that propagates Christian Separatist beliefs. Shanklin tells Heid, you will die in prison before Christian Separatist beliefs are allowed in prison.

*Classification system*

89. Defendant Graves and Roberts profiled the Plaintiffs as active STG members. This profile was created because of Plaintiff's religious beliefs, political beliefs, and use of spiritual symbolism.

90. This classification as STG raises the Plaintiff's profile in the minds of guards and administrators within whatever prison they are housed.

22

91. This arbitrary classification profiling system is not rationally related to maintaining security. There is an obvious alternative to this classification: exemption. The prison can exempt Plaintiffs by allowing them to practice their religion.

92. The classification of these symbols is unreasonable. ODRC does not ban the use of the six-pointed star. Two street gangs use this symbol to advertise their affiliation participation in the gang, the Folks, and Gangster Disciples. ODRC allows this symbol, not knowing if the person using it is Jewish or a member of the Folks or Gangster Disciples.

93. ODRC and the named Defendants have conflated the use of the Swastika with violent white supremacist prison and street gangs. The Aryan Brotherhood engages in drug dealing, extortion, hits against prisoners, and other forms of criminality. Christian Separatism does not condone this behavior.

94. The STG classification is based primarily upon the use of these symbols that the named Defendants had previously accepted. This classification has been used as a pretense to raise the security level of the Plaintiffs.

95. Defendant Shuvallis, John Doe, and Donaldson conducted security reviews of the Plaintiffs and raised their security level in retaliation for their religious practices.

96. Defendants Good and Letts upheld this classification in retaliation for practicing their religion. The plaintiffs have had their security classifications raised and transferred among the different institutions listed in this complaint.

Proscription of Religious

97. The blanket ban on the Christian Separatist faith is based upon STG and ODRC policies. Similarly situated groups of Jewish, Black Hebrew Israelites, Moorish

Scient Temple of America, and Rastafarians are race-based faith groups practiced in ODRC.

98. The Black Hebrew Israelites and Rastafarians use the STG symbol, the Magen-David star, and their beliefs are based on race-separatist views, like Christian Separatists.

99. This ban on Christian Separatism is not rationally related to maintaining security because this is not its basis. In January 2012, the Christian Separatist Church was not considered STG. The religion was unofficially recognized on August 27, 2013.

100. The ban did not occur until the Plaintiffs initiated a legal process, a retaliatory measure to keep them from their religion.

Access to Courts

101. Plaintiffs had instituted legal practices to protect their religious practices in prison. Defendants Chambers-Smith, Defendant John Doe Attorneys, Defendant Nicewagner, Defendant Graves, and Roberts placed both Plaintiffs in the hole on March 28, 2019. The pretense for this retaliation was an investigation. No violations were found as part of this investigation.

102. The denial to access to court did not end with being placed in the hole. Defendant Wright and John Doe Mail staff did not process legal mail according to policies and procedures. This occurred while Plaintiff Heid was held in the hole. The delay and retaliation of Wright and John Doe caused Heid to miss a crucial deadline to the Supreme Court of the United States. It also caused Heid to miss deadlines in District Court.

24

103. Defendants Graves and Roberts have confiscated both Plaintiff's electronic tablets because they were used to communicating with each other. No policies or regulations were cited when taking the pills from both Plaintiffs. While in the hole, neither could Plaintiff access the law library to conduct legal research.

104. Defendant Damron has requested that the mail between him and Heid be determined to be legal. This was denied.

105. Damron has been denied the ability to make copies of legal materials. The procedure for making copies frustrates the ability of the inmate to meet deadlines. This process includes filing a request and giving it to a case manager, who must get approval and make copies. This process takes a week.

106. Damron and Heid have been frustrated communicating with one another. They were not allowed to speak with one another via letter without first having the defendants read all of the material. They are not able to call one another. They cannot use tablets to communicate with each other.

107. On October 4, 2022, Damron appeared before the parole board for his first parole hearing. He was denied parole on October 18, 2022. A majority of the questioning revolved around his Christian Separatist Religion. The other defendants provided false and misleading information regarding his theological beliefs. All of the defendants have conflated white separatism with white supremacy.

**LEGAL CONCEPTS-1983 SUITS**

108. Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. **42 U.S.C. § 1983.** This

section creates no new substantive rights but provides a remedy for violating a federal constitutional or statutory right conferred elsewhere. **Baker v. McCollan, 443 U.S. 137, 144 n.3, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979)**

109. Constitutional violations under section 1983 are a species of tort liability. **See Carey v. Piphus, 435 U.S. 247, 253-55, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978); City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 727, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999) (Scalia, J., concurring partly).** Tort law measures causation by reference to two standards: proximate and but-for cause. "Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." **Paroline v. United States, 572 U.S. 434, 445, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014).** It precludes liability only "where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." **Id.** But-for causation exists where the alleged injury or result would not have occurred "but for" that conduct. **White v. Roper, 901 F.2d 1501, 1505-06 (9th Cir. 1990).**

110. For liability against a supervisor, "liability must be based on more than respondent superior." **Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999).** "Nor can liability of supervisors be based solely on the right to control employees" or "simple awareness of employees' misconduct." **McQueen v. Beecher Cmty. Schs., 433 F.3d 460, 470 (6th Cir. 2006) (internal citations omitted).** Instead, "a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident or misconduct or in some other way directly participated in it.'" **Id.** (quoting Shehee,

199 F.3d at 300). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." **Shehee, 199 F.3d at 300**. "A mere failure to act will not suffice to establish supervisory liability." **Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006).** Therefore, personal liability against a supervisor "under § 1983 must be based on active unconstitutional behavior." ***Shehee, 199 F.3d at 300.***

*CLAIMS*

111. Plaintiffs re-allege all facts contained in paragraphs 1-108.

*Free exercise of religion-First Amendment*

112. The First Amendment guarantees that "Congress shall make no law prohibiting the free exercise [of religion]." **U.S. Const. Amend. I.** Prison inmates retain the protections of the First Amendment, including the Free Exercise Clause. ***O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987).*** However, an inmate's constitutional rights must be balanced against the prison's need to maintain security and order. **Id. at 348-49.**

113. The Sixth Circuit has found, "In any free exercise claim, the first question is whether the belief or practice asserted is religious in the plaintiff's scheme of things and is sincerely held." **Miles v. Mich. Dep't of Corr., No. 19-2218, 2020 U.S. App. LEXIS 26666, 2020 WL 6121438, at *2 (6th Cir. Aug. 20, 2020) (quoting Maye v. Klee, 915 F.3d 1076, 1083 (6th Cir. 2019)) (cleaned up).** Second, the Court must decide "whether the challenged practice of the prison officials infringes on the religious belief." **Kent v. Johnson, 821 F.2d 1220, 1225 (6th Cir. 1987).** If

both elements are met, courts "determine if the prison policy or regulation is reasonably related to legitimate penological interests." **Miles, 2020 U.S. App. LEXIS 26666, 2020 WL 6121438, at \*2 (cleaned up).**

114. Both Plaintiffs are members in good standing of the Christian Separatist Church. These are religious beliefs that are held by both. Both Plaintiffs have embraced and incorporated the symbols and theology in their daily lives. This includes the Runic Cross, the White Chapel Cross, and the Swastika. They further have sought out others to take part in the theology. They have purchased books through legal channels. And practiced religion in church services when possible.

115. Plaintiffs alleged that Defendants Aderhold, Ash, Chambers-Smither, both John Doe Lawyers, Jackson Mitchell, Warden WCI, John Doe, SCI mailroom staff, Agee Mailroom staff WCI, Detty, Donaldson, Figgins, Friend, Gilum, Good, Graves, Hill, Huffman, Letts, Nicewonger, Roberts, Robinson Rosem Rosengartenm Shanklin, Shuvallis, Smith, Windom, and Wright have interfered and intimidated in the free exercise of religion as alleged in the statement of facts.

116. On September 9, 2019, Defendant Graves affirmed under oath that his employer, ODRC, forbids Christian Separatism altogether. It should be noted that similarly situated religious groups of Hinduism, Judaism, Judeo-Christianity, Black Hebrew Israelites, Nation of Islam, and The Moorish Science Temple of America are allowed to practice their religion without interference from the Defendants. The Black Hebrew Israelites, the Nation of Islam, and The Moorish Science Temple of America adhere to the practice of racial separation. The named Defendants do not find them to be Special Threat Groups. The defendants recognize these groups as

religions that inmates are free to choose. The Nation of Islam has been characterized as a black supremacy hate group. They believe that an evil scientist, Yakub, created the white race. The Moorish Science Temple had alleged ties to the violent Chicago street gang, the El Rukns. They also contain individuals who are anti-government, sovereign citizens.

117. Defendants have significantly impeded the Plaintiffs' right to practice the Christian Separatist Church. Their actions, including but not limited to restricting religious communication among adherents and confiscating religious materials, have infringed on the Plaintiffs' spiritual practices.

118. The Defendants' actions appear to lack any penological justification. In 2013, the Defendants had sanctioned the exercise of the Christian Separatist Church, allowing the use of the Runic Cross, the Swastika, the White Chapel Cross, and other religious artifacts. There is no valid reason for the subsequent restrictions imposed on the Plaintiffs' religious practices.

119. Defendants in this action violated the right to practice their religion as guaranteed by the First Amendment to the Federal Constitution. All named defendants acted under the color of state law as employees of the State of Ohio.

*RILUPA CLAIM*

120. The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1, "protects institutionalized persons who are unable freely to attend to their religious needs and are dependent on the government's permission and accommodation for the exercise of their religion." **Cutter v. Wilkinson, 544 U.S. 709, 721, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005).** It achieves this goal

by prohibiting the government from imposing a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability unless the government demonstrates that imposition of the burden on that person is in furtherance of a compelling governmental interest[,] and is the least restrictive means of furthering that compelling governmental interest.**42 U.S.C. § 2000cc-1(a).** "An action of a prison official 'will be classified as a substantial burden when that action forced an individual to choose between following the precepts of [his] religion and forfeiting benefits or when the action in question placed substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" **Hayes v. Tennessee, 424 F. App'x 546, 554-55 (6th Cir. 2011) (quoting Barhite v. Caruso, 377 F. App'x 508, 511 (6th Cir. 2010)) (internal quotation marks omitted); see also Adkins v. Kaspar, 393 F.3d 559, 569-70 (5th Cir. 2004) (holding that a regulation constituted a substantial burden "if it truly pressures the adherent to modify his religious behavior significantly and significantly violate his religious beliefs").** "However, 'prison security is a compelling state interest' and 'deference is due to institutional officials' expertise in this area.'" **Hayes, 424 F. App'x at 554 (quoting Cutter, 544 U.S. at 725 n.13).** The RLUIPA does not subjugate a correctional facility's "need to maintain order and safety" to the "accommodation of religious observances." **Cutter, 544 U.S. at 722.** Suppose a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc . . .. In that case, the government shall bear the burden of persuasion on any element of the

claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.**42 U.S.C. § 2000cc-2.**

121. RLUIPA defines "religious exercise" broadly to encompass "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." **Fox v. Washington, 949 F.3d 270, 278 (6th Cir. 2020) (quoting § 2000cc-5(7)(A)).** Likewise, in the free exercise context, we ask "whether the belief or practice asserted is religious in the plaintiff's scheme of things." **Maye v. Klee, 915 F.3d 1076, 1083 (6th Cir. 2019)**

122. Plaintiffs alleged that Defendants Aderhold, Ash, Chambers-Smither, both John Doe Lawyers, Jackson Mitchell, Warden WCI, John Doe, SCI mailroom staff, Agee Mailroom staff WCI, Detty, Donaldson, Figgins, Friend, Gilum, Good, Graves, Hill, Huffman, Letts, Nicewonger, Roberts, Robinson Rosem Rosengartenm Shanklin, Shuvallis, Smith, Windom, and Wright have interfered and intimidated in the free exercise of religion as alleged in the statement of facts.

123. Both Plaintiffs Ray Heid and James Damron are believers in the Christian Separatist theology. They believe in the tenets that the bible ordains that the races be separate. They think that the symbols that the defendants ban are essential to the free exercise of their religion. They believe that the texts banned by the defendants are critical to the free exercise of their religion.

124. Government action substantially burdens a plaintiff's religious exercise "when it places substantial pressure on an adherent to modify his behavior and to violate

his beliefs" or when it "effectively bars his sincere faith-based conduct."

**Ackerman, 16 F.4th at 184 (cleaned up); see also Thomas, 450 U.S. at 717-18 (explaining that putting a claimant to the choice of forgoing an important benefit or violating his religious tenets puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs").**

125. The named Defendants have placed a substantial burden on all exercise of their Christian separatist religion. This includes holding services in the Chapel. This includes holding services in their cells or the day room. This prohibits sacred texts from being used in their religion. This includes banning the swastika, the runic, and the Greek cross. Neither plaintiff has been able to practice their faith. Prison is a space devoid of spiritual affirmation. Both Plaintiffs must maintain their sanity.

126. Plaintiffs have requested to display their religious symbols again: the swastika, the runic cross, and the Greek crosses. This exception was denied on November 6, 2024.

127. Plaintiff Damron has attempted to receive White Separatist books from outside sources. The Defendants have prohibited him from obtaining and keeping these texts. Notably, on June 7, 2024, the Defendants have confiscated the book " War against Whites."

128. The defendant's Ohio Parole Board denied the Plaintiff's parole based upon their Christian Separatist Beliefs. This was clear from the questioning of Plaintiff Damron in his hearing that they denied him parole based on his religion.

129. Government restriction "is valid if reasonably related to legitimate penological interests." **482 U.S. at 89; O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987).** Under RLUIPA, however, the government must carry a higher burden of showing that the restriction furthers "a compelling governmental interest" and constitutes "the least restrictive means" of advancing that interest. **42 U.S.C. § 2000cc-1(a).**

130. Defendants have restricted the practice and use of the Christian Separatist symbols based upon a supposed security threat. Damron has requested again to have his religion classified as permissible—each time he is denied. Damron and Heid have been under surveillance by the Specific Threat Group policy. Neither have any gang affiliation, and it is entirely based upon their religious beliefs. They are not engaged in extortion, drug sales, violence for hire, or any other type of security threat. The only danger that the defendants can point to is their religion. And this is entirely based upon the beliefs of White Christian Separatism. This includes believing the races should be separated. This consists of the belief that Jewish people are inferior. It does not include the assumption that the white race is superior.

131. The defendants allow African American adherents to the Nation of Islam, who also teach racial separatism. They also teach distrust of the Jewish people. It has been said," Louis Farrakhan and the Nation of Islam (NOI), which he heads, have a long, well-documented record of hate-filled and anti-Semitic rhetoric. Over the years, NOI ministers and representatives have regularly expressed anti-Semitic, anti-white, anti-homosexual, and anti-Catholic sentiments in their speeches.

33

Furthermore, The Final Call, the NOI's official organ, reflects the anti-Semitism of Farrakhan and his organization." **Stephen Roth Institute, Anti-Semitism Worldwide 1997/8. Minister Louis Farrakhan and the Nation of Islam.** They further believe that the white race is inferior and that Yakub, an evil scientist, created the white race. That the white race is evil and inferior. That Jewish people are cruel and inferior. This group is allowed to freely use their symbols and texts, which teach racial separatism and hate. They are not surveilled by the Specific Threat Group and denied the practice of their religion.

132. The defendants have allowed the Black Hebrew Israelites to practice their religion within ODRC. In 2017, the Southern Poverty Law Center (SPLC) listed the Black Hebrew Israelites as one of the "Black nationalist groups of concern," along with the Nation of Islam and others. The SPLC has also described the Black Hebrew Israelites as a hate group that supports racial segregation, Holocaust denial, and homophobia and promotes a race war. As of December 2019, it "lists 144 Black Hebrew Israelite organizations as Black separatist hate groups because of their antisemitic and anti-white beliefs". **Johnson, Daryl (April 8, 2017). "Return of the Violent Black Nationalist". Southern Poverty Law Center.** This group is allowed to practice and use their symbols and texts within the Ohio Department of Rehabilitation and Corrections confines.

133. The defendants have restricted the use of the symbol swastika for security reasons. This symbol was allowed until it was not. During that time, there were no riots in the plaintiffs' prisons. There were no attacks on the Plaintiffs. No attacks on staff. The only use of this symbol would be in services, bible study, and among

34

adherents. Further, there are books in the prison library at Chillicothe that have a swastika.

134. The defendants have restricted the use of the rune and Greek crosses for purportedly the same reason. These symbols were allowed until they weren't. Abruptly, the defendants determined that these symbols were not allowed. Like the other symbol, during the time it was allowed, no one was hurt or attacked. These symbols were used in the practice of their religion.

135. The defendants have restricted the use and possession of texts related to their religion. These books were allowed until they were not. The defendants determined that these books were fine to use in religious practices.

136. Ultimately, all symbols, books, and practices are to be practiced out of sight of other inmates and guards in the chapel or a cell of one of the adherents. There is no reason to believe anyone, but the Plaintiffs and different in their congregation would see the symbols, read the texts, or discuss the theology.

137. Under RLUIPA, "the government cannot discharge [its] burden by pointing to broadly formulated interests." **Ramirez v. Collier, 595 U.S. 411, 142 S. Ct. 1264, 1278, 212 L. Ed. 2d 262 (2022)** (internal quotation marks omitted). "It must instead demonstrate that the compelling interest test is satisfied by applying the challenged law to the particular claimant whose sincere exercise of religion is being substantially burdened." **Id**. (internal quotation marks and brackets omitted); **see also id. In 1281** ("RLUIPA, however, requires that courts take cases one at a time, considering only the particular claimant whose sincere exercise of religion is being substantially burdened.") (internal quotation marks omitted).

This individualized inquiry applies when an inmate seeks permission to engage in group religious services. **Byrd v. Haas, 17 F.4th 692, 694, 699-700 (6th Cir. 2021); see also Haight v. Thompson, 763 F.3d 554, 563-64 (6th Cir. 2014) (applying the individualized-inquiry standard to a request for a sweat lodge that would be used for group services**). Moreover, speculation cannot carry the Department's burden because RLUIPA requires a case-by-case inquiry. **Ramirez, 142 S. Ct. at 1280.** Similarly, "[b]ecause the focus is on the interest in burdening the specific prisoner, the state's interest in merely avoiding other and additional accommodations—a slippery slope—is usually insufficient." **Ackerman, 16 F.4th at 187.**

138.    Crucially, the Department bears the burden of demonstrating there are no less restrictive means to ensure facility security than refusing to recognize Christian Identity. **Ramirez, 142 S. Ct. at 1281**. This is an "exceptionally demanding" standard—the government must "show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by [*538] the objecting party. If a less restrictive means is available for the Government to achieve its goals, it must use it." **Holt v. Hobbs, 574 U.S. 352, 364-65, 135 S. Ct. 853, 190 L. Ed. 2d 747 (2015) (internal quotation marks, alterations, and internal citations omitted).** Finally, "[c]ourts must hold prisons to their statutory burden, and they must not assume a plausible, less restrictive alternative would be ineffective." **Id. at 369** (internal quotation marks omitted). "[I]n the absence of evidence demonstrating (as opposed to lawyer arguments speculating) that the prison considered and rejected alternatives more tailored to

its security interest, the prison's prohibition cannot withstand [the least-restrictive-means] aspect of strict scrutiny." **Haight, 763 F.3d at 564.**

139. The defendants have not used the least restrictive means to achieve the goal of security. They have claimed that using these symbols and texts is a security threat. This is a broad interest that the defendants do not explain to the plaintiffs.

140. The denial of the practice of this religion based on security is too broad of interest. The defendants cannot argue that the Swastika became a security threat when they prohibited its use. It was allowed for several years without any issue. There are books in prison libraries that contain a Swastika. The broad rationale for the prohibition violates RILUPA.

*Freedom of Expression-First Amendment*

141. The Supreme Court has long held that the First Amendment protects communicative action. **See Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 505-506, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969) (holding that wearing a black armband constitutes expressive conduct and is protected by the First Amendment); Brown v. Louisiana, 383 U.S. 131, 141-42, 15 L. Ed. 2d 637, 86 S. Ct. 719 (1966) (holding that a sit-in by Black students constitutes symbolic speech).**

142. A prisoner's claim about censorship of his communications arises under the First and Fourteenth Amendment's guarantee of freedom of speech. **See Procunier v. Martinez, 416 U.S. 396, 408, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974) (citing Lamont v. Postmaster General, 381 U.S. 301, 85 S. Ct. 1493, 14 L. Ed. 2d 398**

**(1965) (other citations omitted)); see also Turner v. Safley, 482 U.S. 78, 85, 107 S. Ct. 2254, 96 L. Ed—2d 64 (1987).**

143. To find a violation, one must determine (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. **Turner, 482 U.S. at 89-90**

144. Plaintiffs alleged that Defendants Aderhold, Ash, Chambers-Smither, both John Doe Lawyers, Jackson Mitchell, Warden WCI, John Doe, SCI mailroom staff, Agee Mailroom staff WCI, Detty, Donaldson, Figgins, Friend, Gilum, Good, Graves, Hill, Huffman, Letts, Nicewonger, Roberts, Robinson Rosem Rosengartenm Shanklin, Shuvallis, Smith, Windom, and Wright have interfered and intimidated in the free exercise of religion as alleged in the statement of facts.

145. Defendants cannot argue a valid connection between the regulation and the interest of security. The Plaintiffs practiced this religion for years without issue. They cannot point to any incident where the Plaintiffs caused a security issue by practicing religion.

146. There is no alternative means of exercising the right. The defendants have prohibited, in total, the plaintiff's theological practice. It may be possible to accommodate this practice, but the defendants have not permitted it.

147. The practice of one's religion has little or no effect on guards or other inmates. The practice would be done in private, not in public spaces. This is not a spiritual request like a sweat lodge, requiring the staff to assist in putting up the tent and starting the fire, etc. This would only require the guard to close and/or lock the cell or chapel door. This private act of practicing one's religion

148. Plaintiffs allege that named Defendants, in their personal and professional capacity, have burdened Plaintiffs free expression of religion without a related or neutral compelling interest to do so. Plaintiffs have been threatened with punishment for the expression of their Christian Separatist faith. Here, Plaintiffs do not wish to wear clothing with a Swastika or have artwork in their cells with the allegedly offensive symbol. They only wish to use the symbol in their church services and imprint it on texts and church material. These things would be used in the practice of religion.

149. The defendants can allow Plaintiffs to practice their religion in the chapel or other meeting room. They can enable them to have texts in their cells. As they did before without a problem, they could do it again.

150. This includes the named Defendants determining without justification that the Plaintiffs cannot use the Runic Cross, the White Chapel Cross, and the Swastika as part of their religious training and exercises.

151. The named Defendants violated the Plaintiff's right to express themselves as protected by the First Amendment to the federal constitution. All named defendants were Ohio employees acting under the color of state law.

152. The named Defendants have prohibited all texts related to Christian Separatism. The Defendants have not even attempted to explain why the Black Separatist groups are allowed to practice their religion in the open in any facility in the ODRC system.

*Freedom of Speech*

153. While prisoners "retain some constitutional protections while incarcerated, including rights provided by the First Amendment," **Bethel v. Jenkins, 988 F.3d 931, 938 (6th Cir. 2021) (citing Turner v. Safley, 482 U.S. 78, 84, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)),** a prisoner's right to freedom of speech is, necessarily, limited by the nature of incarceration. Thus, "[b]ecause lawful incarceration necessarily limits an individual's constitutional rights while in prison, a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" **Id. at 938 (quoting Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)).** Moreover, "given that 'the realities of running a penal institution are complex and difficult,'" prison officials are afforded 'wide-ranging deference' in their decisions regarding prison administration and regulation as courts are generally ill-equipped to deal with these problems." **Id. (quoting Jones v. N.C. Prisoners' Lab. Union, Inc., 433 U.S. 119, 126, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977)).**

154. The defendants have violated the rights of the Plaintiffs by limiting their right to freedom of speech.

*Access to Courts*

155. It is well established that prisoners have a constitutional right to access the courts. **See, e.g., Lewis v. Casey, 518 U.S. 343, 135 L. Ed. 2d 606, 116 S. Ct. 2174 (1996); Bounds v. Smith, 430 U.S. 817, 821-24, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977) (listing case law supporting the right); Wolff v. McDonnell, 418 U.S. 539, 577-80, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1977) (extending Johnson, infra, to cover prisoner assistance in civil rights actions); Johnson v. Avery, 393 U.S. 483, 488-90, 21 L. Ed. 2d 718, 89 S. Ct. 747 (1969) (striking down prison prohibition against inmates aiding one another with applications for habeas corpus); Ex parte Hull, 312 U.S. 546, 549, 85 L. Ed. 1034, 61 S. Ct. 640 (1941) (striking a prison regulation that essentially screened all prisoner habeas applications); Berryman v. Rieger, 150 F.3d 561, 567 (6th Cir. 1998) ("It has long been recognized that the lawful resort to the courts is part of the First Amendment right to petition the Government for a redress of grievances."); John L. v. Adams, 969 F.2d 228, 231-32 (6th Cir. 1992) (listing sources for the right, including the First Amendment).**

156. Plaintiffs alleged that named Defendants, in their official capacities, have interfered with Plaintiffs' access to the court system. Expressly, but not limited to Carradine, Jennings, Ash, Wright, John Doe, and Agee. These Defendants kept the Plaintiff's legal mail from being mailed to the court system, forcing the Plaintiffs to miss important deadlines. These Defendants further kept the Plaintiffs from receiving mail in a timely fashion, causing them to miss deadlines.

*Right of Association*

157. Policies limiting the First Amendment right of association will be deemed valid if the limiting regulations are related to legitimate penological objectives. **Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987***). First Amendment right of association is not absolute in the prison context and can be restricted in favor of a competing governmental interest. **Ford v. Beister, 657 F. Supp. 607 (1986). See also Mayberry v. Robinson 427 F. Supp 297 (MD. Pa. 1977); Patterson v. Walters, 363 F. Supp. 486 (WD. Pa. 1973).**

158. The plaintiffs allege that they are both adherents of the Christian Separatist religion. They have been prevented from holding religious services because of the STG classification by the Defendants. Other so-called racial separatist groups are allowed to hold religious services at ODRC institutions. The rationale provided by the Defendants is that violence will occur if these white separatist views are espoused during these services. This rationale, surprisingly, does not apply to the black secessionist religions allowed to practice at ODRC.

*Retaliation*

159. To state a retaliation claim, "a plaintiff must show that (1) he engaged in protected conduct; (2) the defendant took an adverse action against him 'that would deter a person of ordinary firmness from continuing to engage in that conduct'; and (3) . . . the adverse action was taken (at least in part) because of the protected conduct." **Thomas v. Eby, 481 F.3d 434, 440 (6th Cir. 2007) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).**

160. Both Plaintiffs engaged in protected conduct by seeking to practice their chosen religion. This includes using texts, Bibles, compact discs, and symbols.

161. Defendants took adverse action against the Plaintiffs to keep them from practicing their chosen religion. This included confiscating the texts, materials, compact discs, and any item that contained a swastika, runic cross, or White Chapel Cross.

162. Defendants took the adverse action of transferring both Plaintiffs because of their chosen religious practices.

163. Defendant Ohio Parole Board has retaliated against Damron for practicing his religion in denying him parole. They based their questioning at the October 2022 hearing on their contempt for his religious practices and attempts in the courts to vindicate those rights.

164. Plaintiffs alleged that the named Defendants, in their personal and professional capacities, have retaliated against the plaintiffs for exercising their First Amendment right of free speech. They have done so solely because the Plaintiffs exercised their religion.

*Due process*

165. Plaintiffs allege that the named Defendants, in their personal and professional capacities, abused policies and procedures to deprive liberty interests as alleged in the statement of facts.

*Equal Protections*

166. To state a claim under 42 U.S.C. §1985, Plaintiff must allege that each of the named Defendants engaged in a conspiracy to deprive a person or class of persons of the equal protection of the laws, that the Defendants acted in furtherance of the

43

conspiracy, and that Plaintiff was injured by being deprived of his rights. **Vakilian v. Shaw, 335 F.3d 509, 518 (6th Cir. 2003) (quoting United Bhd. of C&J v. Scott, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983)).** A plaintiff must make sufficient factual allegations to link two alleged conspirators and to establish the "meeting of the minds" essential to the existence of the conspiracy. **McDowell v. Jones, 990 F.2d 433, 434 (8th Cir. 1993).**

167. Here, similarly situated groups that have belief systems that promote racial separation are allowed to exist and flourish within the prison system.

168. This includes the Nation of Islam, whose core belief is that white people are evil and that an evil scientist, Yakub, created them. They have referred to white people as white devils and Jews as the source of evil in the world. They also preach for a separate nation for Black people. Nation of Islam members are not classified as STG and may practice their religion.

169. This also includes the Rastafarians. The core belief is that the Black people are the original Israelites that have been banished to Jamaica. Early termination of this theology has whites as inferior. They expose separatist views as well. Rastafarians are not classified as STG and are allowed to practice their religion in prison.

170. This also includes Black Hebrew Israelites who believe that whites are inferior and Jewish people wicked. They have preached separatist views. This religion can be practiced at ODRC and is not categorized as STG.

171. This also includes the Moorish Science Temple of America. This group was an early permutation of the Nation of Islam. It is still practiced at ODRC and is not classified as STG.

172. Defendant Chambers Smith is the director of ODRC and collaborates closely with Defendant Lambert. He is the Chief Inspector for ODRC. One of his duties is to facilitate STG classifications. Lambert has conspired with the STG coordinators, Defendant Aderholt, Roberts, Gillum, and Graves, to determine that Plaintiff's Religion falls under STG. Lambert and the STG Defendants have, without justification, labeled the Christian Separatist theology as STG. These STG Defendants further conspired with the Wardens of their prisons, Defendants Cook, Robinson, Morgan, and Harris, to continue to list the Christian Separatist religion as an STG group. This conspiracy is ongoing.

## JURY DEMAND

As a result, the plaintiff demands a jury trial of all claims contained in this complaint.

## PRAYER FOR RELIEF

The plaintiff prays for the following relief:

A.  Declaratory Relief- that the Plaintiff's religion is not a security threat.

B.  Injunctive Relief-to prevent the Defendants from discriminating against the Plaintiffs for their exercise of the White Christian Separatist religion.

C.  Damages more than seventy-five thousand dollars as determined by a jury.

D.  Reasonable attorney's fees

E.  A new parole hearing for both Plaintiffs

Respectfully submitted,

**S/ Eric J Allen**

_____
ERIC J ALLEN          (0073384)
The Law Office of Eric J Allen, LTD
4200 Regent, Suite 200
Columbus, Ohio 43219
Tele No. 614.443.4840
 Fax No. 614.573.2924
Email: eric@eallenlaw.com